**Harvey W. WEBSTER, Plaintiff,**

v.

**SINCLAIR REFINING COMPANY, a corporation, Defendant.**

**Civ. A. No. 5673-69-T.**

United States District Court,
S. D. Alabama, S. D.

Aug. 31, 1971.

William H. Saliba, Keener T. Blackmarr, Mobile, Ala., for plaintiff.

Richard W. Vollmer, Jr., Mobile, Ala., Robert Berendt and W. Donald McSweeney, Chicago, Ill., for defendant.

DANIEL HOLCOMBE THOMAS, District Judge.

The above-styled case was regularly set down for trial on June 7, 1971, and after hearing and considering the evidence and arguments of counsel, the Court makes the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

1. Plaintiff, Harvey W. Webster, has brought this private damage suit against the defendant, Sinclair Refining Company, alleging price fixing violations of the Sherman Act and discriminatory pricing policies under the Robinson-Patman Act. The injuries allegedly arose during the period plaintiff was a Sinclair Service Station dealer in 1965 through 1967.

2. Plaintiff operated a Conoco Service Station in Mobile, Alabama, from 1961 to May of 1965. In May he as-

sumed the dealership of a Sinclair Service Station also in Mobile, and across the street from the Conoco Station. Plaintiff operated the Sinclair Station from May 1965 to August 31, 1967. During his last six months of operating the Sinclair Station he held two outside jobs; during the last two months of his operation of the Sinclair Station his outside jobs were full-time and his sixteen year old son operated the station.

3. Plaintiff left the two-bay Conoco Station for the Sinclair Service Station because Roxie Lee, Sinclair's Mobile Marketer, had told plaintiff that he hoped to have a new three-bay station built to replace the then fifteen year old, two-bay building. Lee did not contract with plaintiff that he or Sinclair would in fact build such a station; rather, Lee merely expressed his confidence that Sinclair could be induced to build such a building and expressed his confidence by advancing Webster a $6,000 loan to begin operating the Sinclair Station. Plans for a three-bay station did not materialize.

4. In his dealership agreement with Sinclair, plaintiff agreed to pay rent at the rate of 1.5 cents per gallon of gasoline sold per month with a maximum of $150.00, and a minimum of $100.00. While plaintiff was given a TBA (tires, batteries and accessories) franchise, he was not required and did not in fact purchase all of his TBA from Sinclair. The same was true with Sinclair petroleum products, with of course, the exception of gasoline. Sinclair, at all times, advised plaintiff and all other Sinclair dealers of the suggested retail price per gallon of gasoline. Compliance with this price was optional with the dealer and in fact, plaintiff and some other dealers did not usually follow Sinclair's suggested prices.

5. Fifty percent of Sinclair's Mobile business consisted of sales to certain consumer accounts at a price of 2 cents to 4 cents less than the tank wagon price (TWP). Apparently, some of the consumer business was obtained on a bid basis and others by agreements with the local marketer. A consumer is a fleet operator who has his own tanks and pumps and does not resell gasoline purchases, but rather, uses it in operating his fleet. The consumer account complained of by plaintiff was Southern Bell, which had tanks and pumps one block from plaintiff's station. Southern Bell owns its own tanks and pumps. On one occasion during the period plaintiff operated his station, Southern Bell's pumps were out-of-order and it purchased approximately 4,000 gallons of gasoline from plaintiff in a one month period. Plaintiff gave them a 2 cent per gallon discount. Sinclair has since lost its state-wide contract with Southern Bell.

6. The price that retail dealers paid Sinclair for gasoline bought is called the tank wagon price. Sinclair from time to time gives dealers a temporary voluntary allowance (TVA).[1] The amount of the TVA varies according to the competitive area in which the dealer is located and is primarily used to grant dealers economic relief during "price wars" with other retailers. Sinclair gave all dealers in Mobile County the same TVA with one exception, which was Buck's Truck Stop on the Mobile Bay Causeway. Buck's station is approximately six miles from plaintiff's station and is across Mobile River. Within ½ mile of Buck's station is the Baldwin County line, across which the gasoline tax is 2 cents per gallon less than it is in Mobile County. Because of his location on the causeway, Buck's is considered in a different competitive area than plaintiff and all others in Mobile County. Accordingly, Sinclair, at varying times during the period that plaintiff operated his station, gave Buck's a greater TVA than plaintiff (it varied from .8 to 1.6 cents per gallon more). Moreover, approximately

1. This is a credit of a specific amount allowed each dealer on each gallon of gas sold during the period the TVA is in effect.

90% of Buck's trade comes from trucks with 75% of his sales in diesel fuel. (Plaintiff does not have a diesel fuel pump.) Although the Court finds that plaintiff was not in competition with Buck's, if plaintiff had been given the same TVA that Buck's was given, he would have only earned $411.20 more in the two years he operated the Sinclair station.

7. Sinclair sold to T. J. Purvis (owner of Super Car Wash) at the prevailing TWP but paid him 1.5 cents per gallon sold as rental on the property. Purvis owned the tanks and pumps at the car wash. No evidence was presented that Sinclair would not have paid plaintiff the same rental if he had owned the station. There was evidence that Sinclair had offered another car wash operator a 3.5 cent per gallon rebate on all gasoline sold to it, but the offer was declined. There was no evidence that any rebate was given to any other retail dealer by Sinclair for any reason.

8. Defendants varied the TVA allowed to dealers during price wars. The procedure it followed during such periods was for the marketer or the local sales representative to verify the prices being charged by retailers and to check with the bulk plants of three major oil companies to determine the current posted TWP with whatever TVA in effect. This information was relayed to the Birmingham office where the decision was made whether or not to follow the prices of competition. This procedure was followed only during periods of price wars where retail prices were depressed, and was done only to meet competition.

9. Plaintiff alleged that defendant's credit card policies violated the antitrust laws, but the evidence showed that plaintiff was free to honor any credit card he chose but that he could only use receipts from Sinclair credit card (or cards recognized by Sinclair) to pay his gasoline bill. Sinclair did reject some of these charges because plaintiff didn't follow proper procedure, such as obtaining a signature or failure to check a stolen credit card list furnished to the plaintiff.

10. Sinclair bought all gasoline it sold in the Mobile area from local terminals or bulk plants of other major oil companies. It would then blend its own additives and sell the gasoline under the Sinclair brand name.

11. The Court finds the reason for plaintiff's business failure was his dissatisfaction with the fifteen year old, two-bay station and Sinclair's failure to build a three-bay station as he and Lee had hoped. Also, his second jobs during the last six months of the station's operation were prime contributing factors of plaintiff's losses the second year. Plaintiff has failed to show that he suffered any damage from the policies of Sinclair. In fact, plaintiff's financial statements attached to his income tax returns for the years 1962 through 1967 show only one year (1963) where he made a profit. The Court further finds no relationship between plaintiff's business failure and Sinclair's price differentiations to car washes and consumer accounts.

## CONCLUSIONS OF LAW

1. This Court has subject matter jurisdiction over this case under 28 U.S.C.A. § 1331 and 15 U.S.C.A. §§ 1, 2, 13(a) and 14.

2. To prove a price fixing conspiracy under § 1 of the Sherman Act, plaintiff must establish that the defendant conspired with another entity to fix prices. Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). The only evidence here is that the defendant observed posted TWP and TVA at bulk plants with other major oil companies and that such information was freely given. Such verification is not in violation of 15 U.S.C.A. § 1 if there is present a "controlling circumstance" as required by United States v. Container Corporation, 393 U.S. 333, 89 S.

Ct. 510, 21 L.Ed.2d 526 (1969). The lawful purpose of meeting competition in good faith as required by the Robinson-Patman Act is clearly present here and constitutes a "controlling circumstance" as required by *Container*, supra. Wall Products Co. v. National Gypsum Co., 326 F.Supp. 295 (N.D.Cal.1971).

3. There was no evidence presented showing any vertical price fixing or illegal tie-in agreements.

■ 4. The fact that Sinclair paid a rental payment of 1.5 cents per gallon sold to a retailer who owned his own property does not constitute price discrimination prohibited by the Robinson-Patman Act, as long as this operator paid the same tank wagon price as other operators. Such were the facts in this case.

■ 5. There is no price discrimination in violation of the Robinson-Patman Act if a different price is charged to retailers who are not in competition with one another as is the case here. 15 U.S.C.A. § 13(a).

■ 6. Further, there is no price discrimination if a supplier sells to a consumer at a lesser price than it does to a dealer because the dealer could not compete even if both received the same price since the dealer would have to charge such a consumer a higher price than he paid for it. The Robinson-Patman Act never had as its intention insuring that service station dealers would be given a superior right to sell to fleet operators (consumers) than the gasoline supplier. Such, however, would be the holding if the action complained of by plaintiff did constitute price discrimination. See Rowe, Price Discrimination Under the Robinson-Patman Act, (1963), Page 178; Secatore's Inc. v. Esso Standard Oil Co., 171 F.Supp. 665 (D.Mass.1959).

■ 7. Before there could be a Robinson-Patman price discrimination violation, there must be a transaction that crosses a state line. See Rowe, supra, page 79. Since there is no evidence that the sales in this case were made across state lines those sales are not subject to the Robinson-Patman Act. See Willard Dairy Corp. v. National Dairy Products Corporation, 309 F.2d 943 (6th Cir. 1962); Hiram Walker, Inc. v. A. S. Tropical, Inc., 407 F.2d 4 (5 Cir. 1969).

Accordingly, in consideration of the above, the Court finds that the defendant is entitled to a judgment in favor of the defendant and against the plaintiff.

A judgment will be entered accordingly.