**Thomas E. BELLISTON et al., Plaintiffs-Appellees,**

**v.**

**TEXACO, INC., Defendant-Appellant.**

**No. 71–1064.**

United States Court of Appeals, Tenth Circuit.

Feb. 4, 1972.

Rehearing Denied March 7, 1972.

Lawrence Alioto, San Francisco, Cal. (Peter L. Spinetta, San Francisco, Cal., on the brief), for plaintiffs-appellees.

Milton Handler, New York City (Robert F. McGinnis, New York City and Milas C. Bradford, Jr., Denver, Colo., on the brief), for defendant-appellant.

Before SETH, HOLLOWAY and BARRETT, Circuit Judges.

BARRETT, Circuit Judge.

Plaintiffs-appellees are 15 Texaco Service Station dealers in and around the Salt Lake City, Utah, area. They filed suit against Texaco, Inc. alleging antitrust violations. Trial was to a jury in Salt Lake City. Plaintiffs were awarded treble damages in the amount of $2,623,-317. Plaintiffs-appellees shall be referred to as Dealers. Defendant-appellant Texaco, Inc. shall be referred to as Texaco.

The amended complaint contained two counts, alleging four violations. Count one claimed that Texaco violated the Sherman Act, 15 U.S.C. § 1 et seq. in that it: (1) fixed the retail price at which Dealers must sell their gasoline; (2) coerced the Dealers to buy certain tires, batteries and accessories; and (3) conspired with other oil companies to fix the wholesale price of gasoline. The second count alleged that Texaco discriminated against the Dealers in the price of gasoline in violation of the Robinson-Patman Act, 15 U.S.C. § 13(a). Texaco challenged the lower court's jurisdiction to hear the Robinson-Patman complaint in its answer and amended answer. During trial, Texaco again challenged the court's jurisdiction by its motion to dismiss.

Texaco and six other major oil companies were doing business in the Salt Lake City area together with many other

independent companies during the period June 27, 1963 through June 27, 1967.

All of the Dealers operated retail service stations. They obtained their gasoline from Texaco. They were typical Texaco stations numbering about sixty in this particular area.

## ROBINSON-PATMAN CLAIM

Dealers were awarded $597,011 in damages under 15 U.S.C. §§ 13(a) and 15. They claimed that Texaco sold gasoline to Flinco, a wholesaler, at a price less than that charged the Dealers. Essentially, Dealers had to buy their gasoline from Texaco at a contracted price. That price included trucking charges from American's bulk plant in Salt Lake City to each Dealer's station. Flinco supplied the same services for its stations. It picked up Texaco's gasoline in tank trucks at American's bulk plant and delivered it to various stations. Flinco received from Texaco ½ cent per gallon discount as payment for providing this delivery service above its approximately 4 cents per gallon bulk discount. Flinco owned a number of Texaco stations which it leased to others. At times it was necessary for Flinco to place its own salaried personnel in charge of stations to keep them open. Dealers charge that since Flinco paid less for its gasoline, it was able to sell gasoline from its own stations at a lower price, which it did, thereby injurying Dealers.

Dealers complained of being undersold by Flinco outlets. Although the pump prices for both types of stations were generally uniform, Flinco introduced a "bonus program" in which customers at its outlets were given merchandise and discounts. This program was, in effect, made possible by reason of the bulk discount granted Flinco by Texaco. Flinco sold gasoline to its dealers at 2¢ a gallon lower than Dealers could buy the same gasoline from Texaco. Flinco's Texaco brand stations then gave their customers certificates which could be redeemed for gasoline or other products. They also gave away glassware and chances on a car and a camper. Flinco dealers, in turn, paid for this promotion. It cost each of them about 3¢ per gallon to participate, or a net cost to them of 1¢ per gallon. Dealers claim that this meant that Flinco's Texaco brand stations undersold them even though the retail prices on the pumps were the same for both types of stations.

Before Flinco started the "bonus program", it sponsored "canopy discounts" to customers at its stations. This involved a discount of several cents per gallon from the price showing on the pump. Flinco discontinued this practice when Texaco complained.

Dealers argue that against this background Flinco's 4¢ per gallon wholesale discount was completely unjustified. However, Flinco was required to provide services at its own expense to its outlets which Texaco provided free to its dealers. Flinco (1) provided all of the maintenance for its stations; (2) hired salesmen to take orders from its dealers for products offered; (3) supplied technical advice whenever needed; (4) provided money to pay for needed technical improvements; and (5) provided an accounting service to its dealers. Dealers claim that the ½ cent per gallon rebate was intended to cover all of Flinco's delivery expenses. Flinco was required to deliver gasoline all over the greater Salt Lake City area. This discount did not cover all of Flinco's delivery expenses. It is clear, however, that the total bulk discount to Flinco did create the opportunity for Flinco outlets to undersell Dealers. One of Texaco's employees testified that he was aware of the Flinco "bonus program" but that he was not aware that this meant that Flinco was underselling the Dealers. The first documented complaint received by Texaco from Dealers was a letter dated October, 1966, complaining of Flinco's "bonus program". Flinco's general manager testified that Texaco some time thereafter terminated Flinco's contract (the date is not reflected in the record) because of alleged price cutting. Flinco then instituted a suit against Texaco.

Texaco claims lack of jurisdiction in that all of the alleged discriminatory sales took place in Utah. Texaco contends, and we agree, that the "in commerce" provision of the Robinson-Patman Act has not been satisfied.

Texaco purchased its gasoline on a buy-sell agreement with the American Oil Company. Texaco produced crude oil in Colorado and sold it to American. American then transported this crude oil intermixed with other crude oil via its pipeline to Utah where it was then refined at American's refinery. Texaco then purchased its gasoline, with Texaco's special ingredients, from American. Texaco then distributed the gasoline to its Dealers.

■ For the "in commerce" provisions of the Robinson-Patman Act to be satisfied, the sales must be in interstate commerce. Standard Oil Co. v. Federal Trade Commission, 340 U.S. 231, 71 S.Ct. 240, 95 L.Ed. 239 (1951); Borden Company v. Federal Trade Commission, 339 F.2d 953 (7th Cir. 1964). *Borden* holds that it is not enough to show that a defendant is engaged in interstate commerce; rather, it must be established that the sale complained of was one occurring in interstate commerce. This court discussed the "in commerce" requirement of the Robinson-Patman Act in Food Basket, Inc. v. Albertson's, Inc., 383 F.2d 785 (10th Cir. 1967). Albertson's purchased its goods from two wholesalers in Salt Lake City. The wholesalers brought the goods into Utah and held title to them while in storage. Albertson's in turn supplied its retail stores in Salt Lake City. Albertson's sold 49 nationally advertised items at a lesser price in one of its retail stores than it charged in its other retail stores. Plaintiff Food Basket was in competition with the store charging the lower prices. The trial court granted Albertson's motion for summary judgment, holding that the discriminatory sales were not in commerce. This court affirmed, and said:

"It seems safe to assume that if the post-Meade Bread case law is contrary

to the language used there, the Supreme Court would have corrected the misinterpretation on repeated applications for certiorari. *We take the statute to mean what it says, i. e., that at least one of the discriminatory sales complained of must be in commerce."* (Emphasis ours). 383 F.2d at 787.

All of the discriminatory sales took place in the Salt Lake City area. Also see Becker v. Safelite Glass Corporation, 244 F.Supp. 625 (D.Kan.1965) and Flotken's West, Inc. v. National Food Stores, Inc., 312 F.Supp. 136 (E.D.Mo.1970). (The facts are similar to those in Food Basket, Inc. v. Albertson's, Inc., *supra.* However, here the *defendant* brought the goods into the state). In Hiram Walker, Incorporated v. A. & S. Tropical, Inc., 407 F.2d 4 (5th Cir. 1969), cert. denied 396 U.S. 901, 90 S.Ct. 212, 24 L.Ed.2d 177 (1969), the Court said:

"Thus, the Robinson-Patman Act is applicable only where the allegedly discriminatory transactions took place in interstate commerce. That is, '. . . at least one of the two transactions which, when compared, generate a discrimination must cross a state line . . . .' " (Citation omitted). 407 F.2d at 8–9.

In accord see the *Borden* and the *Standard Oil* cases, *supra*; Food Basket, Inc. v. Albertson's, Inc., *supra*; and Walker Oil Company v. Hudson Oil Company of Missouri, 414 F.2d 588 (5th Cir. 1969), cert. denied 396 U.S. 1042, 90 S.Ct. 684, 24 L.Ed.2d 686 (1970).

In Abramson v. Colonial Oil Company, 390 F.2d 873 (5th Cir. 1968), cert. denied 393 U.S. 831, 89 S.Ct. 99, 21 L.Ed.2d 101 (1968), a service station owner sued its wholesaler-supplier charging price discrimination. It was held that since the supplier purchased the petroleum products within the state, the acts complained of did not occur in interstate commerce.

The lower court's determination that the gasoline was the same "stuff"—i. e., a petroluem product—that Texaco produced in Colorado, thereby creating an

interstate connection, is not valid. Even if this distinction were valid the petroleum products "changed hands". Texaco did not import the crude oil into Utah. Some courts have said that even if the seller brings produce into the state, puts it in a warehouse and then sells to retail outlets there is no interstate commerce. Flotken's West, Inc. v. National Food Stores, Inc., *supra.*

In Lewis v. Shell Oil Co., 50 F.Supp. 547 (N.D.Ill.1943) an oil company had contracted to supply filling station operators with gasoline in Illinois. The gasoline involved was shipped only from the oil company's bulk plant in Illinois to the stations. The Court held that a station operator could not bring an action against the oil company under the Patman Act for alleged price discrimination in favor of his competitors, since only "intrastate commerce" was involved. The oil company's activities in operating a bulk plant from which it supplied stations could not be construed as part of a continuous interstate haul. When gasoline shipped from Shell's Indiana facilities to itself at the bulk plant in Illinois and not designed for any specific customer came to rest, any subsequent local transaction concerning it constituted no part of "interstate commerce" contemplated under the Patman Act. The Court noted that only those acts and transactions which are actually performed "in commerce" satisfy jurisdiction under the Patman Act and that nowhere does that Act confer jurisdiction in relation to transactions which simply "affect commerce". The Court held that the interstate movement ended when the gasoline came to rest in Shell's bulk plant.

There are two important decisions involving raw materials imported into a state, processed into a saleable product and there distributed. In Myers v. Shell Oil Co., 96 F.Supp. 670 (S.D.Cal.1951), the Court held that the plaintiffs, retail service station dealers, could not prevail against Shell under the Patman Act because they failed to prove that the gasoline was involved in, or that the illegal acts complained of, affected interstate commerce. There was no competition between the complaining service station operators and service stations operated in states other than California. Since the plaintiffs did not compete in interstate commerce, the discriminating price activities of the defendant did not have an effect on interstate commerce. *The Court held that the Robinson-Patman Act did not apply to Shell with respect to gasoline it refined from crude oil which Shell itself had imported across state lines into California where the alleged discriminatory sales occurred.* The transactions between the plaintiffs and the defendant were found to be wholly intrastate in character.

In Baldwin Hills Building Material Co. v. Fibreboard Paper Products Corporation, 283 F.Supp. 202 (C.D.Cal.1968), the Court held that the fact that gypsum, used for manufacturing wallboard, was shipped into California and sold to California buyers, did not provide the basis for a price discrimination claim under the Patman Act, which requires that the challenged discrimination occur in interstate commerce. Gypsum is substantially changed in character before it becomes a principal ingredient of wallboard. Accordingly, the Court reasoned that the articles sold to the plaintiff and its competitors had their origin in California. The fact that the raw materials were shipped into California did not provide a basis for a claim under Section 2(a). The Court there noted that some of the shipments apparently included small quantities of wallboard of out-of-state origin. The Court applied the "de minimus" rule in holding that the Act applies only when the interstate aspects of the sales concerned are relatively significant. The defendant was granted a summary judgment on the ground that the alleged discriminations were not "in the course of . . . commerce . .," within the meaning of Section 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13(a).

The lower court held that crude oil and gasoline are the same, i. e., petroleum products. This determination is a

requisite for jurisdiction under the "flow of commerce theory" because only the crude oil crossed the Utah state line. The lower court erred in this conclusion. The production of gasoline from crude oil is a highly technical achievement. Refining has been defined as follows:

" . . . a complicated succession of chemical and physical processes in which the quality of the finished product depends to a large extent on the precision with which the operations are controlled. For this reason the refiner utilizes to the fullest extent the latest developments in the fields of fluid-flow, temperature, and pressure measurements. In modern refinery equipment the operating conditions are critical and the measuring devices are selected to combine accuracy and speed." J. Latta and H. Kauffman, Petroleum Distillation and Testing, p. 50 (1939).

One process in the refining of crude oil is cracking, which has been characterized as follows:

" . . . unbelievably complex, and is well understood only in principle. The numerous possible phases, the various possible or probable steps through which the hydrocarbons may pass to reach that of the final product desired, gasoline, and the undesired, but unavoidable byproducts, fuel oil, carbon, and non-condensable gases, are known only as possibilities. It has not been determined just which of these steps are an integral part of the actual mechanism." A. Foster, Petroleum Cracking and Refining, pp. 1–2, (1939).

The first products of crude oil refining are recovered by distillation. Some of these are: (1) Methane, ethane, (2) Propane, (3) Butane, (4) Light naphtha (component of gasoline), (5) Heavy naphtha, (6) Kerosene, (7) Light and heavy gas oils, and (8) Residue (Source of asphalt or waxes). Petroleum Processing Handbook, Ch. 1, p. 6 (1967).

■ The production of gasoline from crude oil is a highly complex process requiring expensive, precision equipment and skilled technicians. We therefore conclude that when crude oil is refined into gasoline, the character of these products is so changed that they cannot be equated as the "same stuff" to satisfy the requirements of the "flow of commerce" theory.

Dealers have cited several cases in support of their contention that the "in interstate commerce" requirement is met here. These decisions do not aid the Dealers: (1) Dealers cite Standard Oil Co. v. Federal Trade Commission, 340 U.S. 231, 71 S.Ct. 240 (1951), *supra*, for the proposition that when gasoline is shipped across a state line and stored in anticipation of supplying nearly constant market demands, the gasoline remains in interstate commerce. Standard shipped the gasoline to itself across a state line. The product was never altered; therefore, the "flow of commerce" theory applied. This decision is not germane to the questions before us. We note, however, that the case also holds that Standard Oil Co. was permitted to give a 1½ cent per gallon discount to a jobber quite like Flinco in order to meet a competitor's bid. (2) Dealers also urge as support for the "flow of commerce" theory, Food Basket, Inc. v. Albertson's, Inc., 383 F.2d 785 (10th Cir. 1967), *supra*. This case does not lend any support to Dealers' argument. (3) Dealers cite Dean Milk Company v. Federal Trade Commission, 395 F.2d 696 (7th Cir. 1968), in support of the lower court's ruling that crude oil and gasoline are one and the same, i. e., petroleum products. There the Court held that raw milk which was produced out of state retained its essential identity and underwent only minimal changes during processing and it was ultimately sold as milk. The Court distinguished Central Ice Cream Company v. Golden Rod Ice Cream Company, 287 F.2d 265 (7th Cir. 1961), cert. denied 368 U.S. 829, 82 S.Ct. 50, 7 L.Ed.2d 32 (1961), for the holding that when out-of-state butterfat and other ingredients are combined in Illinois, a new product is cre-

ated and the "flow of commerce" theory is inapplicable. *Central Ice Cream* is applicable to the case at bar. Dealers also cite Foremost Dairies, Inc., v. Federal Trade Commission, 348 F.2d 674 (5th Cir. 1965), cert. denied 382 U.S. 959, 86 S.Ct. 435, 15 L.Ed.2d 362 (1965), which is quite similar to the *Dean Milk Company* case, *supra*. (4) Dealers also urge Hardrives Co. v. East Coast Asphalt Corp., 329 F.2d 868 (5th Cir. 1964), cert. denied, 379 U.S. 903, 85 S.Ct. 192, 13 L. Ed. 176 (1964), which involved purchasers of hot mix asphalt. The purchasers alleged a price fixing conspiracy. The Court held that the bitumen used to make the asphalt was in interstate commerce because the bitumen never changed in character. The bitumen was shipped hot in a "natural flowing state" and it was delivered and stored in the same condition. No process, other than heating, was ever performed on the bitumen until after the buyer took possession.

█ The "in commerce" requirement of the Robinson-Patman Act has not been met. The trial court did not have jurisdiction. The judgment recovered under this count is reversed and set aside.

## SHERMAN ACT VIOLATION

█ The lower court directed a verdict in favor of the Dealers on the Sherman Act conspiracy count, and the jury awarded $274,733 in damages. Texaco and the other major oil companies in the Salt Lake City area exchanged information relating to gasoline prices. Dealers alleged that this practice was in violation of the Sherman Act, 15 U.S.C. §§ 1, 2. On appeal, the Dealers concede that this claim must stand or fall on the applicability of United States v. Container Corporation of America, 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969).

In *Container*, the Court held that the reciprocal exchange of price information was a concerted action sufficient to establish the combination or conspiracy element of § 1 of the Sherman Act. The Court found that the price exchanges tended to stabilize prices and thereby chill the vigor of price competition. The

product was fungible and the demand inelastic. It was the practice of these manufacturers to inquire of each competitor, when the information was not available from other sources, the prices charged or quoted to individual customers on specific sales. These requests were usually honored with the expectation of reciprocity. It was understood that the price quoted represented the price currently being bid. This informal price exchange agreement tended to stabilize prices, although at a downward level, thereby invoking the penalties of § 1 of the Sherman Act.

The facts are quite different in the instant case. The price charged for gasoline by Texaco to retail outlets was set by contract. The price information was used by Texaco to lower the price charged to its outlets during price wars in Salt Lake City so that its dealers could meet their competitors' prices. The prices exchanged represented the price being charged each distributor at the competitors' bulk plant, i. e., the Tank Wagon Price. The prices were publicly available. They were noted in the trade journals and often announced in the Wall Street Journal. This distinguishes *Container* in that the prices involved there were not available through other sources. Texaco made its prices available to anyone regardless of any reciprocity.

This case and *Container* differ in other significant respects. In *Container*, the manufacturers-appellees supplied 90% of the demand for cardboard containers. They each competed for the same customers who were known to the manufacturers. The deciding factor which influenced these customers was, of course, price. The customers usually bought from two suppliers at a time and made purchases only for their immediate needs. Contracts were submitted for bids. Competitors had to meet current prices or submit a lower bid to obtain a contract. Thus, in *Container* all of the customers were identifiable to each manufacturer and the "price" quotations exchanged tended to stifle true competition. Here, however, Texaco used the price

information in order to determine how much less it should charge its Dealers during the gasoline wars in Salt Lake City. While the original price had been set by contract, that price varied when it became necessary for Texaco to change it in order to meet competition for the benefit of its purchasers. Texaco's immediate customers were the same day in and day out. These customers had to buy from Texaco at a set price. In *Container* the Court determined that the manufacturers' actions had stabilized prices. In the instant case the record is replete with references to many gasoline wars of long duration involving drastic price cuts. This hardly indicates a "chilling" of the competitive atmosphere. In *Container*, the manufacturers-appellees produced 90% of the containers in their market area. Here, 42% of the gasoline stations in the Salt Lake City area were independently operated. Not only does the record fail to disclose a price exchange agreement among all of the major supplying companies, but it also fails to evidence any exchange involving the suppliers of the independently operated service stations.

Texaco argues that the price exchanges enabled it to meet competition, which is a defense under the Robinson-Patman Act. This defense was discussed in Wall Products Co. v. National Gypsum Co., 326 F.Supp. 295 (N.D.Cal.1971). That case also involved a price exchange agreement. The Court stated:

"[P]laintiffs have continuously asserted that that decision (Container) is controlling here, and that consequently the verification communications of defendants, engaged in long before the decision in *Container*, violated Section 1 of the Sherman Act. Although this Court recognizes that particular pricing information of the nature involved in the verification communications of the defendants in these cases lends itself easily to concerted price fixing activities and to an unconscious direct retardation of the downward trend of prices, and, hence, a stabilizing effect on price, nevertheless, because the Supreme Court made no reference whatever in its opinion in *Container* as to the availability of the 'meeting competition defense' of Robinson-Patman, for reasons hereinafter indicated, this Court does not interpret *Container* as precluding a proven good faith Robinson-Patman defense." 326 F.Supp. 295 at 312.

See also Webster v. Sinclair Refining Company, 338 F.Supp. 248 (D.C.Ala., 1971). We hold that the *Container* decision does not control here.

The rationale of the *Wall Products* case is applicable here. The retail gasoline trade in Salt Lake City underwent many drastic price wars during the period in question. When a war started, it was necessary for the supplier of the retail outlets to grant allowances to their outlets so that they could lower their prices in order to remain competitive. When Texaco heard from one of its Dealers that a competitor had lowered its prices, Texaco endeavored to verify the information. Texaco neither asked for nor received information about impending price changes. By seeking verification Texaco was simply complying with the requirements laid down in Federal Trade Commission v. A. E. Staley Manufacturing Co., 324 U.S. 746, 65 S.Ct. 971, 89 L.Ed. 1338 (1945). That is, Texaco was attempting to confirm the reports of its retail outlets that their competitors had lowered their prices. This much would be necessary before Texaco could lower its prices and still be within the "meeting competition" defense. See also Standard Oil Co. v. Federal Trade Commission, 340 U.S. 231, 71 S.Ct. 240 (1951), *supra*. We hold that the judgment awarded under this count must be set aside.

## VERTICAL PRICE FIXING

Dealers claimed and the jury found that Texaco attempted to set the Dealers' retail price of gasoline. The jury found that this was a violation of the Sherman Act but did not award any damages. Neither party appealed this verdict.

## T. B. A.

Dealers claimed damages from Texaco's policy of requesting them to purchase only sponsored accessory items. Texaco received a 10% commission from the manufacturers of these items. The jury determined that Texaco violated the Sherman Act and that Dealers had suffered damages in the amount of $2,693.

Dealers contend that Federal Trade Commission v. Texaco, Inc., 393 U.S. 223, 89 S.Ct. 429, 21 L.Ed.2d 394 (1968) condemned this same type of T.B.A. arrangement (tires, batteries and accessories) and that Texaco violated the Sherman Act as a matter of law. We disagree.

In Atlantic Refining Co. v. Federal Trade Commission, 381 U.S. 357, 85 S. Ct. 1498, 14 L.Ed.2d 443 (1965), the Court was faced with problems similar to those before us. Atlantic, like Texaco, had a commission arrangement with a tire manufacturer, Goodyear Tire and Rubber Company. Atlantic and Goodyear promoted the exclusive handling of Goodyear products by all of Atlantic's retail outlets. Atlantic employed coercive tactics to force its dealers into complying with the policy of selling only sponsored items. The Supreme Court held that this was not, per se, a tying arrangement. However, the court did treat the arrangement as a tying agreement because of the coercive tactics employed by Atlantic. Atlantic and Goodyear monitored the T.B.A. sales of each outlet and warned dealers if they sold unsponsored T.B.A. Some dealers were threatened with the loss of their leases if they did not comply. The record disclosed coercive acts, thus rendering it unnecessary for the Court to examine the economic impact of the arrangement on the competitive market. The Court made it clear, however, that it did not hold that commission arrangements are per se illegal.

In the instant case we find no evidence of coercion on the part of Texaco. In fact, Dealers' counsel stipulated that there was no coercion. He argued, and the jury was permitted to find, that the commission arrangement, coupled with Texaco's inherent economic power, was a per se violation of the Sherman Act. Dealers argued that this is the law by reason of Federal Trade Commission v. Texaco, Inc., *supra*. In that case, the Court was concerned with a violation of Section 5 of the Federal Trade Commission Act and not a treble damage action under the Sherman Act. The Court in Lee National Corporation v. Atlantic Richfield Company, 308 F.Supp. 1041 (E.D.Pa.1970) distinguished the two when it said:

"In considering . . . and like cases it must be remembered that they did not involve, as here, Federal Trade Commission proceedings under Section 5 of the Federal Trade Commission Act. In such Federal Trade Commission proceedings the function of the Court is somewhat limited in its review of administrative proceedings. Moreover, such proceedings contemplate, not an antitrust action or a treble damage action, as here, but rather the discovery of 'unfair methods of competition', by 'an administrative body of practical men' for the purpose of eradicating business 'evils' in an early or incipient stage. The Court's inquiry is concerned with the order of the Commission; whether it acted within the scope of the authority vested in it; whether there was 'warrant in the record' for its findings and conclusions; whether there is a 'reasonable basis in law' for its order with particular reference, in some instances, to the reasonableness of the remedy reflected in the order. Language used by the Court in thus reviewing a Commission's order may not be taken out of context and used as the basis for a summary judgment in proceedings of a different nature such as a private treble damage action." 308 F.Supp. 1041 at 1047.

It was said in Atlantic Refining Co. v. Federal Trade Commission, *supra*, that:

"It has long been recognized that there are many unfair methods of competition that do not assume the propor-

184

tions of antitrust violations." 381 U.
S. at 369, 85 S.Ct. at 1506.

■ We conclude that, failing to find coercive conduct on the part of Texaco, the commission sales plan is not a per se violation of the Sherman Act. The Court's judgment awarding damages on the alleged T.B.A. claim is set aside.

We reverse and direct that the district court enter judgment for the defendant.