**James M. BACON et al.**

v.

**TEXACO, INC.**

**Civ. A. No. 72-C-11.**

United States District Court,
S. D. Texas,
Corpus Christi Division.

Feb. 28, 1974.

Donald Scott Thomas, Jr., Austin, Tex., for James M. Bacon, and others.

Charles F. Kazlauskas, Jr., New York City, for Texaco, Inc.

## MEMORANDUM AND ORDER

OWEN D. COX, District Judge.

The Plaintiffs in this suit are persons who, at the time this suit was filed (August 3, 1971) or during the previous four years, individually operated one or more gasoline service stations at various locations in the vicinity of Corpus Christi, Nueces County, Texas. The Defendant is Texaco, Inc., (called Texaco) and it leased to each one of these Plaintiffs the particular service station or stations which he operated. Each Plaintiff dispensed gasoline purchased from the Defendant, and did business under the "Texaco" sign.

The Plaintiffs contend that the Defendant has violated Section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C., § 13(a) (1964) as to each one of them; and that the violations resulted because Texaco sold gasoline in Corpus Christi, Texas, to a local business called Texas Star Distributing Company (called Texas Star) at lower prices than the Plaintiffs had to pay. They complain that although Texas Star was a jobber, it was primarily in the business of operating ten (10) retail service stations. The violations occurred during the period August 2, 1967, through August 3, 1971. Admittedly, Texas Star received Texaco's standard-distributor discount; that is, Texas Star was able to buy Texaco's gasoline at a lesser price than the price which the Plaintiff dealers had to pay. The price of gasoline to Texas Star was without regard as to whether it would sell to retailers or use it in its own stations. This allegedly gave the Texas Star stations an advantage over these Plaintiffs in the retail trade of approximately .04 cents per gallon. Thus, the Plaintiffs ask for injunctive relief under Section 16 of the Clayton Act, 15 U.S.C., § 26 (1964); for treble damages of several millions of dollars, in accordance with Section 4 of the Clayton Act, 15 U.S.C., § 15 (1964); and for costs of suit and attorney's fees.

This action was originally filed in the Western District of Texas. The Defendant, subject to its motion to transfer venue, answered and the Plaintiff demanded a jury. Thereafter, by order dated November 1, 1971, the venue of this cause was transferred to the Southern District of Texas, Corpus Christi Division. After pursuing discovery for a time, it became apparent that a great deal more investigation by both parties would be necessary before a trial could be had on the merits. This being the case, the parties filed a joint motion to continue a pre-trial conference from December 18, 1972, until a later date and that discovery, except such as would be pertinent to the question of jurisdiction, be stayed pending a decision by this Court on that question. This motion was granted. The Defendant has now filed its motion for summary judgment, and the jurisdiction question is before the Court. Plaintiff has filed a motion for partial summary judgment, but it will rise or fall depending on the Court's decision as to Defendant's motion.

During the period August 2, 1967, through August 3, 1971, all of the gaso-

line sold by Texaco to the Plaintiffs and to Texas Star Distributing Company was derived from crude oil by a process known as refining. This was done in the State of Texas. More specifically, and prior to August 1, 1967, through approximately July 1, 1969, all of said gasoline was refined at Texaco's refinery located in Port Arthur, Texas, and transported to Corpus Christi by barge via the Gulf Intracoastal Waterway (known as the Intracoastal Canal) and stored at the Corpus Christi terminal of Texaco. It is not denied that the canal is a navigable waterway. From approximately July 1, 1969, to August 1, 1970, all said gasoline sold by Texaco to Plaintiffs and Texas Star was refined by the Coastal States Petrochemical Company (called Coastal States) refineries located in Corpus Christi, Texas, pursuant to a crude-processing agreement dated June 23, 1969. From approximately August 1, 1970, through August 3, 1971, all of said gasoline was refined by the above described Coastal States refinery and acquired by Texaco in Corpus Christi, Texas, pursuant to an exchange agreement dated August 6, 1970.

The Plaintiffs do not deny the facts that have just been set forth, but do take issue with the interpretation placed on them and also point to additional facts which they consider material on the question of jurisdiction. The Plaintiffs say that a significant portion of the crude oil, sometimes referred to herein as petroleum, processed during the period of August 1, 1967, through July 1, 1969, at Texaco's Port Arthur refinery and sold to Plaintiffs in Corpus Christi was produced outside of Texas. And that from July 1, 1969, to August 1, 1970, crude oil derived from outside of Texas was delivered by Texaco to the Coastal States refinery in Corpus Christi, where it was refined on behalf of Texaco for a processing fee, and then delivered to Texaco's Corpus Christi terminal by pipeline. There appears to be no dispute that, during the four-year period here involved, a significant portion of the crude oil which was refined in Texas, by

Texaco or for it, came from outside the state. Part of this petroleum refined at Port Arthur came from Louisiana, Texaco's largest domestic producing area, by a Texaco-owned pipeline. A similar situation existed as to petroleum refined by Coastal States in Corpus Christi. The refined gasoline was then delivered from the Texaco terminal to the purchasers by tank truck unless the purchaser, that is, the customer, picked up the gasoline at the terminal.

Plaintiffs also say that the refining of gasoline is, in principle, merely the separation of gasoline from the other hydrocarbons in the petroleum. Thus, this refining process should not be deemed to break the flow of the product from the time of its out-of-state production and the importation into Texas until its ultimate sale in Corpus Christi. They say that, as a matter of fact, the refining process was such that it did not interrupt the flow of commerce from the time the crude crossed the state line on its way to Texaco's Port Arthur refinery or to Coastal States refinery unil it was sold to Plaintiffs in Texas.

■ Insofar as this Court is concerned, the legal effect of refining gasoline from crude oil is no longer in dispute. Such processing does interrupt the flow of commerce. The petroleum, while it goes through the changing process, ceases being "in commerce" as that term is used in the Clayton Act, as amended by Robinson-Patman, 15 U.S.C., § 13(a). The cases of Belliston v. Texaco, Inc., 455 F.2d 175 (10th Cir. 1972), cert. den., 408 U.S. 928, 92 S.Ct. 2494, 33 L.Ed.2d 341 (1972); Braley v. Texaco, Inc., (C. A. 3–5311–E) (N.D.Tex.1973); Izumi v. Shell Oil Co., 1973 CCH Trade Cases, ¶ 73, 274 (N.D.Col.1972); and Myers v. Shell Oil Co., 96 F.Supp. 670 (S.D.Cal. 1951), have established this. The Fifth Circuit has not written on the particular point with which we are here concerned, but has cited *Belliston* without qualification. And the Court's research indicates there are no cases to the contrary.

Plaintiffs rely on Foremost Dairies, Inc. v. F. T. C., 348 F.2d 674 (5th Cir. 1965), and the other milk processing cases. They are not applicable because of the much less drastic method of processing. There is very little change in it from the milking to the drinking. The case of Hardrives Co. v. East Coast Asphalt Corp., 329 F.2d 868 (5th Cir. 1964), apparently seems important to Plaintiffs. It involves bitumen, a by-product obtained in refining crude oil. Shell Oil Company shipped that substance into Florida from outside the state, and stored it. While the bitumen was stored, it was kept hot and liquid, and when delivered to the Defendants, East Coast Asphalt Corp., et al, who prepared the "hot mix asphalt," it was in the same condition as when it was brought into the state, except it had been blended to meet certain viscosity specifications set by the State of Florida. Such paving material is made by mixing the bitumen with rock and sand. The principal ingredient is bitumen and there is nothing to indicate it is altered by the mixing. We do not quarrel with *Foremost Dairies, Inc.*, supra, or *Hardrives Co.* that the particular commodities there involved continued in commerce. But, we are not willing to disregard *Belliston v. Texaco, Inc.*, supra, because of either of those cases. We also point out that the only jurisdictional question before the Fifth Circuit there had to do with the Sherman Act, which has considerably broader coverage than Clayton-Robinson-Patman. *Cliff Food Stores v. Kroger, Inc.*, 417 F.2d 203 (5th Cir. 1969); *Lehrman v. Gulf Oil Corp.*, 464 F.2d 26 (5th Cir. 1972).

There are other facts, not in dispute, relating to the overall Texaco operations which Plaintiffs contend are material. These operations, such as its multistate activities, including bartering in goods, its foreign business and import quotas, its crude-processing agreement with Coastal States and the several modifications, the pipeline extending over many states, the use of the Gulf Intracoastal Waterway for transportation of gasoline, and others, are calculated, as the Plaintiffs see things, to show that the Texaco sales here complained about occurred in the "flow of commerce" and thus meet the "effect on commerce" test which Plaintiffs say should govern here. They seriously take the federal courts to task for having limited the coverage under Robinson-Patman, 15 U.S.C., § 13(a), to "fewer transactions than could be constitutionally reached." In addition to the discussion of the foregoing facts, a careful review of the legislative history of the Robinson-Patman Act has been provided this Court in support of a broader interpretation of the Act.

But, Littlejohn v. Shell Oil Co., 483 F.2d 1140 (5th Cir. 1973, en banc), cert. den., 414 U.S. 1116, 94 S.Ct. 849, 38 L.Ed.2d 743 (1973), has settled the question for this Court. The statutory language requiring discriminatory sales to be "in commerce" is narrower than the "effect on commerce" test applicable under the Sherman Act. *Lehrman v. Gulf Oil Corp.*, supra, also approved this analysis.

*Littlejohn* also demonstrates that Moore v. Mead's Fine Bread Company, 348 U.S. 115, 75 S.Ct. 148, 99 L.Ed. 145 (1954), does not expand the coverage under Robinson-Patman. So, Plaintiffs can get no consolation out of *Mead's Fine Bread* in the Fifth Circuit.

This Court concludes that it has no jurisdiction to proceed with this case and that the motion for summary judgment filed herein by the Defendant should be granted. IT IS SO ORDERED. There are no controverted facts involved and no indication that the Plaintiffs could produce other facts which might show sales made "in commerce," as this Court has interpreted such language. The motion for partial summary judgment of Plaintiffs must be denied. A final judgment granting summary judgment to Defendant will be prepared and signed by the Court. The Clerk shall furnish copies of this memorandum and order to appropriate counsel.