CANADIAN AMERICAN OIL COMPANY
and Frederick M. Tautenhahn, partners
and dba Frederick M. Tautenhahn-Cana-
dian American Oil Company, Plaintiffs,

v.

UNION OIL COMPANY OF
CALIFORNIA, Defendant.

No. C–72–2034 WHO.

United States District Court,
N. D. California.

Jan. 23, 1976.

**474**

Maxwell P. Keith, Philip Keith, San Francisco, Cal., Friedenberg & Hedger, Daly City, Cal., for plaintiffs.

Douglas C. Gregg, Los Angeles, Cal., John E. Sparks, Brobeck, Phleger & Harrison, San Francisco, Cal., for defendant.

## MEMORANDUM OPINION AND ORDER

ORRICK, District Judge.

This action calls upon the Court to consider the limitations on its jurisdiction under the federal antitrust laws. Plaintiffs, the partnership of Canadian American Oil Company and Fred Tautenhan, were former dealers of Union Oil Company of California (Union) gasoline. They allege that defendant has enforced and conspired to enforce a resale price maintenance scheme in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) (the Act). Plaintiffs further allege that Union has utilized this price maintenance program in an attempt to monopolize the sale of gasoline in the San Jose-Fremont, California, region in violation of Section 2 of the Act (15 U.S.C. § 2).

Union, having conceded many facts for the purposes of this motion only, has moved for summary judgment based on a lack of federal jurisdiction. Specifically, defendant claims the acts complained of by plaintiffs are not in interstate commerce. The Court, having considered the memoranda and affidavits on file in this action, as well as the oral arguments of counsel, for the reasons hereinafter set forth, grants defendant's motion for summary judgment.

### I. Facts

Plaintiffs own and operate a number of retail gasoline stations in California. Their various stations are supplied by several of the major gasoline suppliers. In February and March, 1972, plaintiff began negotiating a gasoline supply contract with Union for deliveries to two of plaintiffs' service stations. In April, 1972, Union and plaintiffs executed a gasoline purchase contract for the sale of Union branded gasoline at plaintiffs' San Jose station and plaintiffs' Fremont station. The contracts provided that plaintiffs would pay the standard Posted Dealer Purchase Price for the gasoline, but all parties understood that plaintiffs would shortly be entitled to a two cents per gallon discount on the price in the form of a sign rental agreement. The plaintiffs were also led to believe that within a few months they would be entitled to a Union jobbership provided they showed themselves to be satisfactory dealers. The possibility of obtaining the jobbership particularly interested plaintiffs and was one of the main inducements for them to deal with Union.

Plaintiffs began selling Union gasoline at their San Jose and Fremont stations in April, 1972. They priced their gasoline from two to five cents below the prevailing market prices for other major branded gasoline in the area. Responding to complaints of price-cutting from competing Union dealers, Union representatives contacted plaintiffs and urged them to keep their prices within two cents of the prevailing market price. Plaintiffs, however, persist-

ed in their price-cutting practices. As a result of these renegade pricing policies, plaintiffs' requests for the promised sign rental discount as well as for the jobbership were denied. Plaintiffs threatened to sue Union for its refusal to bestow the promised benefits. Union then invoked the ninety-day termination clause in the gasoline supply contract and terminated plaintiffs as Union dealers. Plaintiffs remained in business at their San Jose and Fremont gasoline stations selling Phillips Petroleum gasoline at these two service station locations.

Both plaintiffs' San Jose and Fremont gas stations were located in shopping centers well within the borders of California. Neither station was located adjacent to an interstate highway. Their customers were largely local suburban residents. During 1972 plaintiffs' combined purchases for both stations varied from a high of 284,512 gallons for the month of May to a low of 273,250 gallons in July. All of the Union gasoline distributed to plaintiffs was refined in California at Union's Oleum refinery. During 1972 total shipments of gasoline from the Oleum refinery averaged 33,-321 barrels per day. From Oleum the gasoline was shipped via pipeline to San Jose, California, and then by truck from the San Jose terminal to plaintiffs' stations. Although plaintiffs allege that Union, through exchange agreements with other major gasoline suppliers, also mingled out-of-state gasoline in the transporting pipeline, they have been unable to document that they ever received any of this out-of-state gasoline. However, it is clear that large percentages of the raw ingredients used in refining the gasoline are shipped to the Oleum refinery from out of state.

While plaintiffs were Union dealers they purchased their gasoline under a wholesale pricing system which Union utilized throughout the ten states comprising its Western Region. Under the plan Union would publish Posted Dealer Purchase Prices for a given region. The Posted Dealer Price fluctuated in accordance with the prevailing retail prices charged by major competitors in a given region. Union established a retail price of $.082 above the Posted Dealer Purchase Price as a cutoff point for price supports to its dealers. A retail price of $.082 above the Posted Dealer Purchase Price was defined as the Adjustment Price. If the prevailing retail price was less than the Adjustment Price, Union would then reduce its Posted Dealer Purchase Price downward by $.007 for each cent per gallon that the prevailing retail price had fallen below the Adjustment Price. Although the Posted Dealer Purchase Price for individual zones within the Western Region would vary, depending on the prevailing competitor retail prices in a given zone and the concomitant need for Union to provide its dealers with price supports, the pricing system was standardized throughout the Western Region states. Union dealers were required to purchase under this standard wholesale system; however, their purchase contracts did not require them to sell at the retail level at any set prices.

## II.  Jurisdiction

### A.  The Flow-of-Interstate-Commerce Test

█ Before the federal courts have jurisdiction to review alleged antitrust violations, plaintiffs must establish (1) that the acts complained of occurred within the flow of interstate commerce or (2) that the acts complained of, while wholly intrastate, substantially affected interstate commerce. *Las Vegas Merchant Plumbers Ass'n v. United States,* 210 F.2d 732 (9th Cir. 1954), *cert. denied* 348 U.S. 817, 75 S.Ct. 29, 99 L.Ed. 645 (1954). Plaintiffs contend that they satisfy the jurisdictional requirements under each of these tests. I disagree.

█ Plaintiffs first assert that the interstate shipment of the raw ingredients used in producing the end-product gasoline brings the gasoline itself within the flow of commerce. However, it is well settled that when raw ingredients are shipped to a manufacturer for processing, the manufacturer is the intended ultimate consumer of the raw goods, and consequently the chain of flow stops at the processing plant. 1 Von

Kalinowski, *Antitrust Laws and Trade Regulations* § 5.01(2) at 5–57 (1971). The only major exception to this general break-in-flow principle applies to highly perishable foodstuffs such as dairy products where the raw ingredients must be processed so quickly that the shipment of the raw goods to the processor, the processing at the dairy plant, and the shipment of the end product to the ultimate consumer has been considered one uninterrupted chain. *Peveley Dairy Co. v. United States,* 178 F.2d 363 (8th Cir. 1949), *cert. denied* 339 U.S. 942, 70 S.Ct. 794, 94 L.Ed. 1358 (1950). The components of gasoline being far less perishable than dairy foodstuffs would not invoke this break-in-flow exception.

In considering this same question of continuity of flow between the raw and end products in the gasoline industry, the Tenth Circuit in *Belliston v. Texaco, Inc.,* 455 F.2d 175 (1972), concluded that the refining process so transforms the component elements that "they cannot be equated as the 'same stuff' to satisfy the requirements of the 'flow of commerce' theory". *Belliston v. Texaco, Inc., supra,* at 180. Although the court in *Belliston* was specifically discussing the question of jurisdiction under the more stringent jurisdictional tests of the Robinson-Patman Act (15 U.S.C. § 13(a)) rather than under the Sherman Act which is relied on in the instant case, the question of continuity of flow for ingredients and end products in the gasoline industry would be the same under both statutes, and *Belliston* is applicable. I find that plaintiffs have failed to establish that the acts complained of occurred within the flow of commerce.

### B. *Affecting-Commerce Test*

█ Nor does the Court find that plaintiffs have satisfied the "affecting-commerce" jurisdictional test. Although plaintiffs point to the general interstate aspects of Union's large scale business dealings, the test of jurisdiction under the Sherman Act "is not that the acts complained of affect a business engaged in interstate commerce, but that the conduct complained of affects the interstate commerce of such a business". *Page v. Work,* 290 F.2d 323, 330 (9th Cir. 1961), *cert. denied* 368 U.S. 875, 82 S.Ct. 121, 7 L.Ed.2d 76 (1961).

█ Again plaintiffs point to the purchases of substantial quantities of out-of-state supplies used in refining the gasoline and assert that the claimed antitrust violations would have a direct, substantial and adverse affect on these interstate shipments. However, plaintiffs have failed to establish that the alleged price fix or their termination as Union dealers in any way reduced the quantity of gasoline produced by Union at its Oleum refinery. Nor have they shown that the alleged violations reduced the out-of-state purchases of raw ingredients used in the production of gasoline. Almost all businesses, no matter how local, will utilize out-of-state products to some degree. The mere fact that out-of-state goods are somewhere utilized in the business transactions of either party does not, standing alone, support federal jurisdiction. *John Kalin Funeral Home, Inc. v. Fultz,* 313 F.Supp. 435 (W.D.Wash.1970), *aff'd per curiam* 442 F.2d 1342 (9th Cir. 1971), *cert. denied* 404 U.S. 881, 92 S.Ct. 210, 30 L.Ed.2d 162 (1971); *Sun Valley Disposal Co. v. Silver State Disposal Co.,* 420 F.2d 341 (9th Cir. 1969).

It is true that this circuit has looked to the out-of-state purchases of goods to support jurisdiction under the affecting-commerce test in *Gough v. Rossmoor Corporation,* 487 F.2d 373 (9th Cir. 1973), and *Rasmussen v. American Dairy Association,* 472 F.2d 517 (9th Cir. 1972). However, both of these cases involved situations where the alleged anti-competitive practices were aimed at totally eliminating a competitive product from the market. *Rossmoor* involved the elimination of a competing carpet dealer while *Rasmussen* discussed a conspiracy aimed at completely destroying the market for "GO", a liquid milk drink. In both of these cases, the plaintiffs were able to establish that the elimination of their businesses, and their product lines, would necessarily result in a significant decrease in interstate purchases of the supplies or ingredients utilized in producing their

goods. Plaintiffs in the instant action have failed to show that their elimination as Union dealers in any way substantially affected the continued interstate purchase of supplies by Union.

Finally, plaintiffs contend that Union's interstate use of its wholesale pricing scheme necessarily had a substantial effect on interstate commerce and that a challenge to such an interstate plan is properly reviewed by the federal courts. Plaintiffs seek to bring themselves under the jurisdictional protections of *Simpson v. Union Oil Co.,* 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964), and *Lehrman v. Gulf Oil Corporation,* 464 F.2d 26 (5th Cir. 1972), *cert. denied* 409 U.S. 1077, 93 S.Ct. 687, 34 L.Ed.2d 665 (1972). However, I find that neither of these opinions is specifically applicable to the fact situation presently before the Court.

In *Simpson* the Supreme Court made it clear that even a single local dealer could challenge an inherently coercive price-fixing scheme. In *Lehrman,* Judge Wisdom, writing for the court, expanded on the *Simpson* doctrine holding that a widely utilized pricing plan, even if benign on its face, could be reviewed by the federal courts if the plan was allegedly coercively applied against even a single local plaintiff. In both *Simpson* and *Lehrman* the coercion used by the defendants was inherent in the interstate pricing plan. In *Simpson* a purchase consignment agreement by its terms required the dealers to sell at a specified price. In *Lehrman,* Gulf utilized a wholesale pricing system with built-in price supports, admittedly analogous to the system used by Union in its Western Region. In retaliation for Lehrman's price-cutting activities, Gulf withdrew his price supports. The coercive leverage of removing the price supports from wayward dealers was inherent in the pricing system since all wholesalers depended on the availability of price assistance. Although Gulf had only applied the coercive withdrawal technique to a single plaintiff, the Fifth Circuit properly feared that the oil company need only make an example of a few dealers to insure that their other wholesalers would keep their prices in line with company dictates. The local application of coercive leverage inherent in the pricing plan, therefore, had a pervasive and substantial effect on many dealers involved in interstate commerce.

In the case at bar, however, the element of coercive leverage inherent in the pricing policy is missing. Unlike the situation in *Simpson,* Union's wholesale pricing policy is not coercive on its face. Dealers are instructed that they are free to set their own retail prices. Indeed, a virtually identical pricing program which was concededly administered in a noncoercive fashion was recently sustained by the First Circuit in *Butera v. Sun Oil Company, Inc.,* 496 F.2d 434 (1st Cir. 1974).

Nor was the coercive withholding of the promised benefits of a sign rental allowance and a jobbership inherent in the Union pricing plan. Plaintiffs were promised these future benefits because of their unique position as large volume dealers. Indeed, the possibility of a jobbership was such an unusual business opportunity that plaintiffs were induced to begin dealing with Union rather than just continue their past dealing practices with several other major gasoline suppliers. Plaintiffs do not seriously assert that the promised discount and jobbership were somehow part of the wholesale pricing system or were promised to dealers on a widescale basis.

In contrast to the situation in *Lehrman,* Union did not attempt to regulate plaintiffs' prices by a threatened or actual attempt to withdraw price supports. Until plaintiffs were terminated, they were able to participate in the price support program despite their refusal to follow Union's pricing instructions. At most, the undisputed facts establish that when plaintiffs exercised their independent pricing discretion, Union attempted to keep them in line by coercive techniques independent of its widespread pricing program. An isolated atypical application of coercion upon dealers who are purchasing gasoline under an inherently benign pricing system would not have set a threatening example to other wholesalers

who had never been promised the business benefits withheld in the first place. The coercion applied to plaintiffs had no more of an effect on the gasoline industry than the regulation of the prices charged by plaintiffs in their local operations.

Nor do I find particularly persuasive on this jurisdictional question two cases decided in this district and cited by plaintiffs. In *Hamamciyan v. Mobil Oil Corp.,* 1973–2 Trade Cases ¶ 74,722 (N.D.Cal.1973), Judge Conti relied on *Simpson v. Union Oil Co., supra,* and *Lehrman v. Gulf Oil Corporation, supra,* to sustain federal jurisdiction in a dealer termination case. However, it appears that the court in *Hamamciyan* was reviewing a potentially widespread anti-competitive withdrawal of price supports, not as here, an isolated and atypical use of a coercive lever against dealers who also happened to purchase their gasoline under a uniform pricing system. In *Westphalen v. Mobil Oil Corp.,* 1973–1 Trade Cases ¶ 74,-423 (N.D.Cal.1972), Judge Peckham denied a defendant's motion for summary judgment in an antitrust dealer termination case because there were material issues of fact in dispute. In that case, the court was not even addressing the jurisdictional question.

The question of jurisdiction being a factual issue that must be determined on a case-by-case basis (*Lehrman v. Gulf Oil Corporation, supra*), I find that a review of the facts, conceded and undisputed for this motion, fails to support federal jurisdiction under either the "in-the-flow-of" or the "substantial-effect-on" commerce theories. It may be that the conduct of Union herein alleged, if proven, may rise to the dignity of a violation of California's antitrust law, the Cartwright Act (Cal.Bus. & Prof.Code § 16700 *et seq.*), but, interstate commerce being absent, this Court has no jurisdiction under the Sherman Act. Accordingly, defendant's motion for summary judgment is granted.

Plaintiffs' complaint having been dismissed for lack of federal jurisdiction, defendant's pendent state counterclaims for breach of contract and conversion, lacking an independent jurisdictional basis, must also be dismissed. 3 Moore, *Federal Practice* ¶ 13.15[1] at 382 (2d ed. 1974); *Manufacturers Cas. Ins. Co. v. Arapahoe Drilling Co.,* 267 F.2d 5 (10th Cir. 1959); *City of Houston v. Standard-Triumph Motor Co.,* 347 F.2d 194 (5th Cir. 1965). Accordingly, defendant's counterclaims are dismissed for lack of jurisdiction.

IT IS HEREBY ORDERED that on or before February 5, 1976, defendant shall lodge with the Court a form of judgment approved as to form by the plaintiffs.