**FOOD BASKET, INC., Appellant,**

v.

**ALBERTSON'S, INC., Appellee.**

No. 8623.

United States Court of Appeals
Tenth Circuit.

Oct. 13, 1967.

Robert W. Hughes, Salt Lake City, Utah, for appellant.

Richard W. Giauque, Salt Lake City, Utah (Dennis McCarthy, Salt Lake City, Utah, was with him on brief) for appellee.

Before MURRAH, Chief Judge and PICKETT and BREITENSTEIN, Circuit Judges.

MURRAH, Chief Judge.

The primary issue in this appeal from a summary judgment in a private antitrust suit is the applicability of Section 2(a) and (f) of the Robinson-Patman Act (49 Stat. 1526, 15 U.S.C. § 13(a)); and Section 2 of the Sherman Act (15

U.S.C. § 2, 26 Stat. 209), to a seller of merchandise who is engaged in interstate commerce but discriminates in price only as between purchasers in one county— Salt Lake County, Utah.

On the basis of the complaint, supporting discovery and statement of counsel, the court concluded that the discriminatory purchases complained of were not "in commerce" so as to come within the scope of the Robinson-Patman Act and granted summary judgment for lack of subject matter jurisdiction. It also dismissed the action insofar as it was based on Section 2 of the Sherman Act " * * * for failure to state a claim upon which relief can be granted and for failure to disclose to the court a reasonable factual basis for such claim * *."

The plaintiff-appellant, Food Basket, Inc., operated an independent supermarket at Taylorsville, a suburb of Salt Lake City, Utah. The defendant-appellee, Albertson's, Inc., is an interstate supermarket chain operating several stores in the Salt Lake City area, including one across the street and down from Food Basket's Taylorsville store. The complaint alleged that the goods sold to the public from the grocery markets which is the "subject matter of this action * * * moved in interstate commerce * * * from their various points of origin across state lines to wholesalers located in Utah or Idaho and then shipped to the respective parties in this action, who in turn sold them to customers in Utah and particularly in the Taylorsville, Utah area." It was then stated that from December 1963 to July 1964 (when Food Basket went out of business) Albertson's offered for sale at its Taylorsville store selected food products at prices lower than it charged for like food products at its other Salt Lake City area stores; that it sold certain items at its Taylorsville store at low and unprofitable levels, all for the purpose of driving Food Basket out of business; and that it succeeded in doing so by subsidizing its losses "with profits earned from other retail stores where [Food Basket] was not a competitor."

Food Basket's discovery developed proof that Albertson's regularly sold forty-nine nationally advertised grocery items at its Taylorsville store at lower prices than it charged for the same items at its other Salt Lake City area stores.

Albertson's motion for summary judgment was based upon the premise that Food Basket's case was plainly grounded upon price differentials in Albertson's stores in Salt Lake County, and that it had not identified "a single sale in interstate commerce as a part of the discriminations charged." Reference was made to the uncontroverted affidavits to the effect that all of Albertson's stores in Salt Lake County purchased their groceries and frozen food requirements from two wholesale companies in Salt Lake City; that both of the wholesale companies buy for "their own account and take title to the goods", and except for "infinitesimal" drop shipment sales, all merchandise comes to rest in the wholesaler's respective warehouses prior to any resale; and that all purchases of the forty-nine nationally advertised items identified in Food Basket's proof, took place wholly within Salt Lake County. On this factual basis, Albertson's insisted that none of the purchases involved in the alleged discriminations were in commerce as required by Section 2(a) and (f) of the Robinson-Patman Act.

On the eve of the hearing on the motion for summary judgment, Food Basket submitted an affidavit of one of its attorneys in which he stated that on the day before, he had been permitted to examine the invoices of one of the wholesale companies and that such examination revealed that "all of the food products involved were manufactured outside of the State of Utah and shipped to Utah in interstate commerce"; and that additionally his investigation had revealed that Albertson's purchased certain enumerated food items directly from manufacturers outside the State of Utah; and moreover, Albertson's proof demonstrated that it carried on its discriminatory activities by subsidizing them

"through the use of its interstate treasury."

In the extensive and revealing argument on the motion for summary judgment, the trial court came quickly to the point on which its judgment is based by pressing Food Basket's counsel to demonstrate in what way the alleged discriminatory sales in the Salt Lake City area can be said to be "in commerce", hence within the interdiction of Section 2(a) and (f) of the Robinson-Patman Act.

Counsel's response was twofold. First, he took the position that under the dictum of Moore v. Meade Fine Bread Co., 348 U.S. 115, 75 S.Ct. 148, 99 L.Ed. 145, purely local discriminatory sales by a seller engaged in interstate commerce, were within the scope of Section 2(a) if it is shown that interstate profits· were used to subsidize the local discriminatory sales. Second, and alternatively, he took the position that the goods sold by Albertson's in the Salt Lake area originated outside the State of Utah and were shipped to the wholesalers in contemplation of sales to Albertson's retail stores; that under the "practical continuity" theory, such sales were in commerce within the meaning of 2(a) and (f).

Justice Douglas did use language in the Meade Bread case which, considered out of context, may be susceptible to the construction urged upon us here. But, we are not persuaded that it was intended to be so construed and applied. In that case, Meade, with a bakery in New Mexico, was engaged in interstate commerce. In the course of such commerce, it sold bread interstate to merchants in Texas at prices higher than it sold the same product locally in New Mexico in a price-cutting campaign. We did not think that the purely local price-cutting war involved commerce within the meaning of 2(a). But, on appeal, we were taught that if the profits from the higher interstate sales were used to "underwrite the losses of the local price-cutting campaigns" the competitive injury was within the scope of 2(a). But, the discriminatory sales, the profits of which subsidized the local price-cutting campaign, were in commerce within the meaning of the Act, which plainly says that "[I]t shall be unlawful for anyone engaged in commerce, in the course of such commerce * * * to discriminate in price between different purchasers of commodities of like grade and quality where either or any of the purchases involved in such discrimination are in commerce * * *."

Since Meade Bread, the critical language of 2(a) has been repeatedly construed to mean that the seller must not only be engaged in interstate commerce, but that one of the discriminatory sales must be in commerce. Central Ice Cream Co. v. Golden Rod Ice Cream Co., 7 Cir., 287 F.2d 265; Willard Dairy Corp. v. National Dairy Products Corp., 6 Cir., 309 F.2d 943, Cert. denied 373 U.S. 934, 83 S.Ct. 1554, 10 L.Ed.2d 691; Borden v. Federal Trade Commission, 7 Cir., 339 F.2d 953; Cream Crest-Blanding Dairies, Inc. v. National Dairy Products Corp., 6 Cir., 370 F.2d 332; Jones v. Metzger Dairies, Inc., 5 Cir., 334 F.2d 919, Cert. denied 379 U.S. 965, 85 S.Ct. 659, 13 L.Ed.2d 559. Cf. Atlas Building Products Co. v. Diamond Block & Gravel, 10 Cir., 269 F.2d 950; Continental Oil Co. v. Frontier Refining Co., 10 Cir., 338 F.2d 780; Utah Pie Co. v. Continental Baking Co., 386 U.S. 685, 87 S.Ct. 1326, 18 L.Ed.2d 406.

It seems safe to assume that if the post-Meade Bread case law is contrary to the language used there, the Supreme Court would have corrected the misinterpretation on repeated applications for certiorari. We take the statute to mean what it says, i. e., that at least one of the discriminatory sales complained of must be in commerce. In the course of the argument on the motion for summary judgment and post-judgment motions to reconsider, counsel sought leave to amend to allege and show that Albertson's sold the Southern Idaho stores the same products at higher prices than at its Taylorsville store. But, significantly, it did not offer to show that any of the Idaho sales were "in commerce." From the colloquy between court and counsel,

and from what was said in the post-judgment motion, it appears that the Idaho sales were effected in the same manner as the Utah sales, that is to say, the goods were shipped from without the State to Idaho wholesalers, where they came to rest and were then shipped to retailers on order. This being so, Food Basket's case would fail for want of an interstate leg, for two purely local discriminatory sales in different states do not make out a case of "in commerce" within the meaning of 2(a).

▆ This brings us to the "practical continuity" theory that substantially all the goods sold in Utah or Idaho were processed and packaged outside the state; that some of such goods were shipped across state lines directly to retailers; that the remainder were shipped across state lines to the wholesalers in anticipation of orders from retailers; and that this being so, the discriminatory sales were in the flow of commerce and within the interdiction of 2(a).

It is, of course, true if goods originating out of the state can be said to be shipped to the wholesalers in anticipation of orders from the retailers, or if a substantial part of the goods were shipped directly out of the state to the retailers as drop shipments, the discriminatory sales are within the scope of 2(a) and (f) and certainly Section 2 of the Sherman Act. Burké v. Ford (10 CA May 15, 1967) 377 F.2d 901. But there is no countervailing proof, either by affidavit or otherwise, that any of the merchandise shipped across the state line to Utah or Idaho wholesalers were pursuant to or in anticipation of orders from any of the retailers. Admittedly, some drop shipments moved directly from out of the state to the retailers. But Albertson's affidavit proof says that they were "infinitesimal" and we do not understand Food Basket to contend that they were not. There is no contention that any of the forty-nine items involved in the alleged price discrimination were drop shipments directly from outside the state. But, even so, they could have contributed to the support of the dis-

criminatory sales in a manner to aid and abet the success of the local price-cutting war. In order to do so, however, the shipments must have been more than infinitesimal or de minimis. See Skinner v. United States Steel Corp., 5 Cir., 233 F.2d 762.

▆ We realize, as did the trial court, that summary disposition of all litigation, especially antitrust cases, is not favored and that amendments should be freely and liberally granted to the end that all cases are decided on their merits. See Nationwide Auto Appraiser Service, Inc. v. Association of Casualty & Surety Companies, et al (10 CA decided Sept. 1, 1967) 382 F.2d 925; Travelers Indemnity Co. v. United States of Am. for the use of Construction Specialities Co. (10 CA decided Aug. 30, 1967) 382 F.2d 103; Bushman Const. Co. v. W. S. Conner Const. Co., 10 Cir., 307 F.2d 888. When, however, this case is considered in the light of the pleadings and the proof in support of it, together with the statement of counsel, it is unmistakably grounded on a misinterpretation of Section 2(a) and (f) of the Patman Act.

▆ We take a different view, however, of the pleadings and proof as applied to the broader reaches of Section 2 of the Sherman Act. In the first place, the motion for summary judgment was not directed to the claim that the alleged acts violated the Sherman Act. On the motion, Albertson's counsel frankly conceded that he had not thought of the plaintiff's case in terms of the Sherman Act, and it does not appear that the trial court gave any consideration to the question whether the local discriminatory practices can be said to affect the free and uninterrupted flow of goods into the State of Utah. Even though the discriminatory practices may have only a trivial impact on interstate commerce, they may be sufficient to come within the Sherman Act. See Burke v. Ford, supra, citing Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122.

Liberally construing the pleadings, we cannot say that they failed to state a

claim upon which relief can be granted under Section 2 of the Sherman Act. Nor can we say that a reasonable factual basis for such claim was not disclosed. The summary judgment based upon the claim of violation of Section 2(a) and (f) of the Robinson-Patman Act is accordingly sustained. Judgment on Section 2 of the Sherman Act is vacated and the case is remanded to allow amendment to the pleadings and proof in support thereof.