**RIO VISTA OIL, LTD., Plaintiff,**

v.

**The SOUTHLAND CORPORATION and Citgo Petroleum Corporation, Defendants.**

**No. C–86–1009J.**

United States District Court, D. Utah, C.D.

April 13, 1987.

L.R. Gardiner, Jr., Salt Lake City, Utah, for plaintiff.

Peter W. Billings, Jr., Salt Lake City, Utah, Mark J. Spooner and James Sandman, Washington, D.C., for defendants.

## MEMORANDUM OPINION AND ORDER

JENKINS, Chief Judge.

This case involves the retail gasoline business, particularly as it exists in Salt

Lake County, Utah. In brief, plaintiff Rio Vista Oil, Ltd. (Rio Vista) claims that the defendants The Southland Corporation (Southland) and Citgo Petroleum Corporation (Citgo) have engaged in anticompetitive practices in the retail sale of gasoline in the Salt Lake County area.

This case is now before the court on defendant Citgo's motion to dismiss and/or for summary judgment on the entire complaint, motions of both defendants to dismiss and/or for summary judgment on that portion of count one based on section 1 of the Sherman Act and motions of both defendants to dismiss count two. After consideration of the parties' oral arguments and written briefs, and for reasons set out further herein, this court denies defendants' motions as to count one, and grants in part and denies in part defendants' motion as to count two.

We take the facts as alleged by plaintiff.

Plaintiff Rio Vista operates twenty-six retail "convenience" type outlets that sell gasoline and other petroleum products, along with groceries and snacks. Rio Vista owns no crude oil and does not refine the petroleum products it sells. It purchases gasoline from refineries and sells it, unbranded, in its twenty-six "self-service independent" stations. Twenty-two of the plaintiff's stores are in Utah and four are in Idaho.

Defendant Southland operates the national chain of 7–Eleven stores. Defendant Citgo is an oil refiner which was a wholly-owned subsidiary of Southland from 1983 to October 1, 1986.[1] Citgo brand gasoline is sold in 7–Eleven stores throughout the nation. Although Citgo supplies many of the nation's 7–Eleven stores with gasoline from its refinery in Louisiana, in other parts of the country Southland and Citgo supply the 7–Eleven stores with petroleum products refined by others and obtained at least in part pursuant to exchange agreements. Defendants obtained gasoline for their Utah, Idaho and Colorado 7–Eleven stores from a Utah refinery. They then transported the gasoline from the Utah refinery to stores in the three states for sale by them to retail customers.

Rio Vista claims that Southland, in an attempt to drive independent self-service stations out of business, has deliberately cut its retail gasoline prices in geographic areas where it faces competition from independent stations, specifically in the Salt Lake City area. Rio Vista claims that 7–Eleven gasoline prices in the Salt Lake City area were lower than prices charged by Southland to its customers in other areas and at times were below defendants' cost. Rio Vista claims Southland chose the locations for its stores in Salt Lake City with the intention of driving plaintiff and other independent operators out of business. All this, according to plaintiff, was done for the purpose of destroying competition.

Rio Vista has pleaded three claims for relief. Count one alleges that the defendants' actions amounted to a contract, combination and conspiracy in violation of section 1 of the Sherman Act and an attempt to monopolize in violation of section 2 of that act. Additionally, Rio Vista claims such actions were in violation of the parallel provisions of the Utah Antitrust Act, Utah Code Ann. §§ 76–10–911 through –926. Count two alleges that the defendants have engaged in unlawful price discrimination in violation of section 2 of the Clayton Act as amended by sections 2 and 3 of the Robinson-Patman Act, 15 U.S.C. §§ 13 & 13a. Plaintiff also claims that defendants discriminated in price between different locations within Utah, in violation of the Utah Unfair Practices Act, Utah Code Ann. §§ 13–5–3 & 76–10–903. Finally, Count three is based entirely on Utah state law and alleges below-cost sales in violation of the Utah Unfair Practices Act, Utah Code Ann. §§ 13–5–7 & 76–10–903.

The defendants responded to the complaint by filing the three motions currently before the court. The first of these seeks dismissal of, or in the alternative summary judgment on, the entire complaint with respect to Citgo. This motion is primarily based on Citgo's assertion that it had nothing to do with pricing decisions made in the

1. On October 1, 1986, Southland sold a 50%     interest in Citgo to Petroleos de Venezuela, S.A.

Salt Lake area. Second, both Citgo and Southland move for dismissal of that portion of count one based on section 1 of the Sherman Act. They argue that since 1983 and until October 1986 Citgo was wholly owned by Southland. Thus, defendants argue, the two entities were legally incapable of conspiring with each other within the meaning of section 1 of the Sherman Act, 15 U.S.C. § 1. Third, both defendants have moved to dismiss count two claiming that the jurisdictional prerequisites for a Robinson-Patman claim have not and cannot be satisfied under the facts alleged in the complaint.

1. Citgo's motion for dismissal or summary judgment with respect to the entire complaint.

■ Citgo claims, and supports this claim with the affidavit of its vice-president, that it did not participate in any of the sales of gasoline that gave rise to the claims for relief in the complaint. Although the affidavit, if uncontroverted, might well be sufficient for summary judgment, plaintiff has not yet had the opportunity to establish, through adequate discovery, the facts needed to resist a rule 56 motion. Federal Rule of Civil Procedure 56(f) contemplates that motions for summary judgment should not be granted if discovery has not been had and would be helpful. In compliance with that rule, plaintiff has filed an affidavit affirmatively stating the need for adequate discovery. Therefore, the court at this time denies the motion for summary judgment. Likewise, the motion to dismiss must fail. The complaint alleges enough to allow discovery on the issue of Citgo's participation, if any, in the retail sales of gasoline in Utah, Idaho, and Colorado. The parties acknowledge that gasoline is sold under the Citgo brand name in Utah, Idaho and Colorado. Thus there is some evidence of possible participation by Citgo in the fuel's production, purchase, or resale to the public. Moreover, the record before the court does not yet reveal what exchange agreements with Citgo, if any, were involved in the purchas-

es of gasoline from Utah refineries by Citgo and Southland. Considering the facts as pleaded in the light most favorable to the plaintiff, the court concludes that this motion is premature and must be denied at this time.

2. Defendants' motion to dismiss that portion of the complaint based on Section 1 of the Sherman Act.

Both Southland and Citgo have moved for summary judgment or dismissal on the basis that they were legally incapable of "conspiring" with each other within the meaning of section 1 of the Sherman Act. Plaintiff's first claim for relief asserts a claim under sections 1 and 2 of the Sherman Act as well as the corresponding Utah antitrust provisions. However, this motion is directed solely to that portion of count one that attempts to state a claim under section 1 of the Sherman Act, 15 U.S.C. § 1.

■ Section 1 of the Sherman Act reads in pertinent part: "Every contract, combination in the form of a trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared illegal." 15 U.S.C. § 1. It is now beyond dispute that liability under this section requires concerted action between at least two separate entities. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768, 104 S.Ct. 2731, 2740, 81 L.Ed.2d 628 (1984); *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984); *Albrecht v. Herald Co.*, 390 U.S. 145, 149, 88 S.Ct. 869, 871, 19 L.Ed.2d 998 (1968). It is also clear, as defendants point out, that a wholly-owned subsidiary is not, for purposes of Section 1 liability, a separate entity from its parent corporation. *Copperweld*, 467 U.S. 752, 104 S.Ct. at 2731. During the period that Citgo was 100% owned by Southland, the two corporations were legally incapable of forming, at least between themselves, a "contract, combination ... or conspiracy" [2] in violation of section 1.

**2.** In oral argument, Rio Vista sought to distinguish *Copperweld* on the basis that it involved

only conspiracies, and not contracts or combinations. Contracts or combinations, counsel

Rio Vista recognizes the *Copperweld* case places limits on section 1 liability, but argues that a passage in that case establishes that Citgo and Southland are not necessarily entirely immune from liability under that section. In that passage, the Court stated: "It has long been clear that a pattern of acquisitions may itself create a combination illegal under § 1, especially when an original anticompetitive purpose is evident from the affiliated corporations' subsequent conduct.... In [*United States v. Yellow Cab Co.*, 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947)·], the affiliation of the defendants was irrelevant because the original acquisitions were *themselves* illegal." *Copperweld*, 467 U.S. at 761, 104 S.Ct. at 2736–37 (emphasis by the Court, footnotes omitted). The Court added in a footnote: "[O]ur point is not that *Yellow Cab* found only the initial acquisition illegal; our point is that the illegality of the initial acquisition was a predicate for its holding that any postacquisition conduct violated the Act." *Id.*, n. 5. This court reads these passages from *Copperweld* as leaving a gap in the case's otherwise bright line rule of intraenterprise immunity from section 1 liability. If a combination is formed between two separate entities for the purpose of restraining trade, their subsequent coordinated actions could be part and parcel of an original, illicit combination. Separate economic entities that unite for anticompetitive goals remain separate for purposes of Section 1.

Defendants argue that the focus of the complaint is not on Southland's acquisition of Citgo but on subsequent conduct. That may be true, but the complaint does give notice that the original acquisition is challenged as well. Complaint, ¶ 8 ("in the course of said unlawful contract, combination and conspiracy, defendant Southland Corporation acquired control of defendant Citgo"). For this reason, it would be inappropriate to dismiss plaintiff's section 1 claims at this point.[3]

3. The Robinson-Patman and associated claims.

The plaintiff's claim for price discrimination is based on the provisions of section 2 of the Clayton Act, as amended by sections 2 and 3 of the Robinson-Patman Act, 15 U.S.C. §§ 13 and 13a, and the parallel provisions of the Utah Unfair Practices Act, Utah Code Ann. §§ 76–10–903 and 13–5–3.

The defendants resist this claim in several ways. First, defendants argue that no private right of action exists under 15 U.S.C. § 13a (section 3 of the Robinson-Patman Act), and that such an action should not be implied under the Utah criminal price discrimination provision, Utah Code Ann. § 76–10–903. Second, because each 7–Eleven offered gas at one price to all customers at a particular store at any one time, defendants argue that price discrimination could not exist as a matter of law for either the state or federal claims. Finally, with respect to the federal Robinson-Patman claims, defendants argue that the sales at issue were not in interstate com-

---

suggested, may not require concerted action. The court is not persuaded. *Copperweld* was phrased in terms of section 1 liability in general, and the requirement of concerted action cuts across all forms of activity proscribed by section 1. 467 U.S. at 768, 769, 104 S.Ct. at 2740–41; *Albrecht v. Herald Co.*, 390 U.S. 145, 149, 88 S.Ct. 869, 871, 19 L.Ed.2d 998 (1968). Indeed, the distinction between the three terms in section 1 has become hazy enough so as to lead one court to note that "the statutory language presents a single concept about common action, not three separate ones: '"contract ... combination or conspiracy" becomes an alliterative compound noun, roughly translated to mean "concerted action."'" *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 111 (3d Cir.1980) (quoting *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 445–46 (3d Cir.1977) *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978) (quoting L. Sullivan, *Law of Antitrust* 312 (1977))).

3. Of course, there are potentially two narrow time periods during which Southland and Citgo were capable of conspiring with each other, regardless of the acquisition's legality. Those are the period prior to the acquisition and possibly that period subsequent to the sale of 50% of Citgo to a Venezuelan company and prior to the filing of the complaint in this action on November 3, 1986. (*Copperweld* explicitly did not rule on the question of whether a corporation can conspire with a partially owned subsidiary. 467 U.S. at 767, 104 S.Ct. at 2739–40.)

merce, and therefore the jurisdictional prerequisites of the Act are not satisfied.

The relevant section of the Robinson-Patman Act states:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, ... and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce.

15 U.S.C. § 13(a).[4] For good or ill,[5] the Act has now been with us for fifty years.[6] It is this history, often confused and conflicting, that this court must now seek to reconcile.

▮▮▮ Two portions of the defendants' motion are dealt with easily. At oral argument, plaintiff conceded that it has no claim under the federal criminal provisions of the Robinson-Patman Act. No private right of action is implied within this portion of the statute. *Nashville Milk v. Carnation Co.*, 355 U.S. 373, 78 S.Ct. 352, 2 L.Ed.2d 340 (1958). Likewise, this court does not find a private cause of action in the Utah criminal price discrimination statute. It is worth noting that generally Utah antitrust laws are to be construed in harmony with the federal antitrust scheme. *See* Utah Code Ann. § 76–10–926 ("The legislature intends that the courts, in construing this act, will be guided by interpretations given by the federal courts to comparable federal antitrust statutes"). Utah statutes, like the federal statutes, do provide a private cause of action for price discrimination. Utah Code Ann. § 13–5–3. This court can find no additional cause of action in section 76–10–903.

Southland also argues that because at any one 7–Eleven store the prices charged for gas were available to all customers, it cannot be guilty of discriminatory pricing. This argument confuses "secondary line" analysis with "primary line" thinking.[7] As with any primary line case, plaintiff does not assert that the favorable price was unavailable to all comers; rather, it asserts that prices charged in Salt Lake were discriminatorily low, when compared to those charged in Idaho and Colorado, and that the low prices in Salt Lake were part of the defendants' predatory conduct in that market. The Robinson-Patman Act proscribes such conduct.

In harmony with other primary line cases, plaintiff's claim is a predatory pricing case. *See Pacific Engineering and Production Co. of Nevada v. Kerr-McGee Corp.*, 551 F.2d 790, 798 (10th Cir.) cert.

---

**4.** Subsection (a) goes on to provide for certain affirmative defenses to a price discrimination claim, such as differences in cost or meeting competition.

**5.** The Act is and has been both reviled and praised, mostly reviled. *See* E. Kintner and J. Bauer, *The Robinson-Patman Act: a look backwards, a view forward*, 31 Antitrust Bull. 571, 572 n. 5 (1986) (discussing criticisms and praises for the Act, and citing over forty different articles as examples of the "literally hundreds of pieces praising, criticizing, and analyzing the act"). The Act is notable for the creative forms of criticism it spawns. *See* F. Rowe, *Price discrimination under the Robinson-Patman Act*, 535 n. 4 (1962) (collecting several choice quotes from various critics of the Act); Comment, *Eine Kliene Juristische Schlummergeshichte*, 79 Harv. L.Rev. 921, 922 ("Yet I am shocked at what your practicing lawyers say about [the Act]. They call it 'crystal clear confusion' requiring 'legal bifocals' and compare their job in advising under it to the stability of a dog walking on his hind legs. Other lawyers say it is difficult to explain without using both hands, and often having to remove one shoe, because each new decision creates 'a new snake pit' of unsettled problems"); W. Baxter, *A Parable*, 23 Stan.L. Rev. 972 (1971) (describing difficulties with a similar statute enacted in the land of Oz).

**6.** Time has not clarified the Act nor quieted its critics. *See, The Robinson-Patman Act: a Symposium on its Fiftieth Anniversary*, 31 Antitrust Bulletin 571 (1986); *The Robinson-Patman Act Revisited in its Fiftieth Year*, 55 Antitrust L.J. 133 (1986) (panel discussion).

**7.** Primary line cases are brought by competing sellers of the product in question, on the basis that the discriminatory price in some way adversely affects competition at the level of the seller. In contrast, secondary line suits are brought by disfavored buyers, alleging that some preferential price given to a competing buyer harms competition at the buyer level. This is a primary line case.

*denied,* 434 U.S. 879, 98 S.Ct. 234, 54 L.Ed.2d 160 (1977) (recognizing that a primary line claim of price discrimination is one for predatory pricing). The gist of the complaint is that the discrimination occurred *between* stores, specifically between stores in and outside the Salt Lake area. In effect, the Robinson-Patman Act, as applied to the primary line level, provides a remedy for local predatory pricing by interstate firms in addition to that found in sections 1 and 2 of the Sherman Act, without, apparently, any requirement of concerted action or near-monopolization. *See Moore v. Mead's Fine Bread Co.,* 348 U.S. 115, 119, 75 S.Ct. 148, 150, 99 L.Ed. 145 (1954). This may be a result of the special fear of predatory pricing which Congress perceived in passing both the Clayton and Robinson-Patman Acts; the potential consequences of such conduct were perceived as so grave that the practice was to be "nipped in the bud" before it could result in monopoly. *See* P. LaRue, *Competitive Injury—Primary Line,* 53 Antitrust L.J. 863 (1986).

It is true that the Robinson-Patman Act of 1936 was principally motivated by a desire to protect competition at the secondary line level. The Act was a reaction to the perceived danger that large chain stores might use their purchasing power to force special price concessions from their suppliers, thereby *obtaining* competitive advantages over smaller, competing buyers. But the Act amended, and sought to strengthen, the existing section 2(a) of the Clayton Act, which was originally enacted to protect primary line competition. In 1914, when Congress first enacted section 2(a), Congress was concerned not with secondary line competition, but rather with localized price-cutting campaigns by large interstate firms directed against smaller, local firms—comparable to the situation plaintiff alleges in the present case. *F.T.C. v. Anheuser-Busch, Inc.,* 363 U.S. 536, 543–44,

80 S.Ct. 1267, 1271–72, 4 L.Ed.2d 1385 (1960). Congress, in amending the Clayton Act with the Robinson-Patman Act, did not intend to displace its original primary line protection. That protection should not be read out of the Act.

According to the complaint, prices charged in Salt Lake were lower than those charged in other areas of Utah, as well as in Idaho and Colorado, and the effect of this unjustified discrimination has been or will be to substantially lessen competition in the Salt Lake area. That is enough for a primary line case.

The final issue is a narrow one: whether the factual allegations of the complaint satisfy the jurisdictional requirements of the Robinson-Patman Act. Defendants argue that the sales alleged to be discriminatory were not in interstate commerce. In addition, defendants argue that no retail sale can ever be in interstate commerce because such sales are inherently local in character. This court disagrees.

Jurisdiction under the Robinson-Patman Act is narrower than that under the Sherman Act. Price discrimination requires at least two sales which, when compared to each other, generate a discrimination. In order to fall within the federal price discrimination statute, at least one of the sales must have occurred "in commerce."[8] *Gulf Oil v. Copp Paving,* 419 U.S. 186, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974). This has been interpreted as requiring that the transaction "in commerce" must actually cross a state line; that is, the product must physically cross a state boundary. *Id.; See also, Black Gold, Ltd. v. Rockwool Industries, Inc.,* 729 F.2d 676, 683 (10th Cir.1984) (in claim of price discrimination in sales of insulation, only those sales in which insulation crossed a state line could be used to compare with other contemporaneous sales to find a price discrimination). This is in

---

**8.** Actually, the Act has three jurisdictional requirements relating to interstate commerce. The discriminator must be "engaged in commerce," the challenged discrimination must have occurred "in the course of such commerce," and "either or any of the purchases involved in such discrimination" must have been "in commerce." 15 U.S.C. § 13 (quoted above). However, if a claim of price discrimination satisfies the third test of "in commerce," it will necessarily satisfy the first two requirements. F. Rowe, *Price Discrimination Under the Robinson-Patman Act* 78–79 (1962).

contrast to the more lenient requirement of the Sherman Act, which merely requires some substantial effect on interstate commerce, *Mandeville Island Farms v. American Crystal Sugar Co.*, 334 U.S. 219, 234, 68 S.Ct. 996, 1005, 92 L.Ed. 1328 (1948); *McLain v. Real Estate Bd. of New Orleans*, 444 U.S. 232, 242, 100 S.Ct. 502, 509, 62 L.Ed.2d 441 (1980), and the Federal Trade Commission Act, which also requires only an effect on interstate commerce, 15 U.S.C. § 45(a)(1). In the present case, one of the sales of gasoline that plaintiff alleges generated a discrimination must have occurred in interstate commerce. It does not matter which of the sales were "in commerce" as long as "either or any" of the sales in Utah, Colorado or Idaho satisfies the requirement. 15 U.S.C. § 13(a); *See Moore v. Mead's Fine Bread*, 348 U.S. 115, 75 S.Ct. 148, 99 L.Ed. 145 (1954) (Jurisdiction existed under Robinson-Patman Act for a claim brought by a New Mexico baker against another New Mexico-based baker which made sales in Texas as well as in New Mexico).

In the present case, according to the complaint, the gasoline sold in Idaho and Colorado was refined in and transported from Utah. Defendants argue, however, that the gasoline "came to rest" when delivered to the various 7–Elevens. Thus, at the time the gasoline was sold to the retail customers, defendants argue, it was no longer "in the flow" of interstate commerce.

In *Standard Oil v. F.T.C.*, 340 U.S. 231, 71 S.Ct. 240, 95 L.Ed. 239 (1950), Standard Oil shipped gasoline from out of state into large storage tanks in Detroit, Michigan. The gasoline was stored in the tanks over periods of months. Sales of the gasoline from the tank were made to Michigan distributors, solely for resale in Michigan. Nevertheless, the Supreme Court held that the sales to the Michigan distributors remained in the flow of interstate commerce. Even though the gasoline was not brought to the storage tanks on specific orders, the needs of the customers were well known by Standard Oil and the gasoline's temporary storage in the tanks did not "deprive the

gasoline of its interstate character." *Id.* at 238, 71 S.Ct. at 244.

The *Standard Oil* case is instructive in the present case for at least two reasons. First, as in the *Standard Oil* case, the temporary storage of gasoline at 7–Elevens in Idaho and Colorado does not necessarily deprive the fuel of its interstate character. Something more is required, such as a change in ownership, a significant interruption in the product's distribution to consumers or changes in the product itself. *See Belliston v. Texaco, Inc.*, 455 F.2d 175 (10th Cir.), *cert. denied*, 408 U.S. 928, 92 S.Ct. 2494, 33 L.Ed.2d 341 (1972) (crude oil shipped interstate loses its interstate character upon refining). Second, *Standard Oil* teaches that, for a transaction to be in interstate commerce both parties do not have to deal across state boundaries; it is enough that one party crosses the line in order to consummate the deal. In *Standard Oil*, the fact that the distributors did business only in Michigan did not deprive the gasoline sales of their interstate character. Likewise, in the present case, the fact that the gasoline is sold to local consumers should not take the sales out of the Act's coverage. The analysis of the jurisdictional character of the transaction focuses on the path taken by the goods involved, not exclusively on the nature of the parties to the sale.

Both parties cite *Food Basket, Inc. v. Albertson's Inc.*, 383 F.2d 785 (10th Cir.1967). In that case, Albertson's shipped goods to warehouses in Utah and Idaho before they were shipped to grocery stores in their respective states. Normally, when goods from out of state are shipped to warehouses that ship only intrastate, the goods "come to rest" at the warehouses and are no longer in the flow of commerce. However, there is an exception to this rule when the warehouse serves only as an intermediary in the goods' transport: if the goods are intended for specific customers before they arrive at the warehouse, they do not lose their interstate character by pausing at the warehouse. Plaintiffs in the *Food Basket* case argued that shipments were made to warehouses in antici-

pation of specific retailers' orders, as well as shipped directly to the retailers. The Tenth Circuit held that the plaintiff had failed to show that the goods were shipped to the warehouses in anticipation of the retailers' orders or that a substantial part of the allegedly discriminatory sales were shipped directly to retailers. Based on this failure to demonstrate facts supporting jurisdiction under the Robinson-Patman Act, the court of appeals affirmed the summary judgment on that count. However, in so doing, the Tenth Circuit noted in dicta that "if a substantial part of the goods were shipped directly out of the state to the retailers as drop shipments, the discriminatory sales are within the scope of [the Robinson-Patman Act]." [9] 383 F.2d at 788. In the case at hand, gasoline from Utah refineries is shipped directly to retail stores in Utah, Colorado and Idaho. Temporary storage at the 7–Elevens does not necessarily alter the gasoline's interstate character.

Defendants rely primarily on two cases from the Fifth Circuit Court of Appeals, *Walker Oil Co. v. Hudson Oil Co. of Missouri*, 414 F.2d 588 (5th Cir.1969), and *Cliff Food Stores, Inc. v. Kroger, Inc.*, 417 F.2d 203 (5th Cir.1969), for the proposition that sales to retail gasoline customers are always intrastate in character and therefore cannot fall within the Robinson-Patman Act's prohibitions. Both these cases hold that retail sales of goods shipped in interstate commerce are not in commerce except in three narrow circumstances.[10] This court declines to follow the reasoning of

the Fifth Circuit. First, the dicta in *Food Basket* arguably teaches a result contrary to the two Fifth Circuit cases. In that case the Court of Appeals for the Tenth Circuit indicated that retail sales of interstate goods might fall within the jurisdictional boundaries of the Robinson-Patman Act. Second, the Fifth Circuit's interpretation of the Act's jurisdictional requirements runs counter to the purposes of the Act. Under the reasoning of *Walker Oil* or *Cliff Foods*, any firm could avoid liability under the Act simply by vertically integrating itself down to the retail sales level. Nothing in the Act's text or history suggests an intent to exclude primary line competition from its protections when it occurs on the retail level. Third, the emphasis in both *Walker Oil* and *Cliff Foods* on the fact that the retail customers are "random," 414 F.2d at 589, 417 F.2d at 210, is misplaced. Generally speaking, the nature of the purchaser is less relevant to the jurisdictional analysis under the Robinson-Patman Act than is the nature of the product and the seller. 15 U.S.C. § 13(a).[11] Finally, *Gulf Oil v. Copp Paving*, 419 U.S. 186, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974), a case normally cited as limiting jurisdiction under the Act, clearly contemplated a practical approach to jurisdictional analysis that encompassed retail sales.

*Copp Paving* did not require that the actual exchange involved in a sale occur with the parties' hands stretched across a state boundary.[12] Rather, the case advo-

---

**9.** The discriminatory sales referred to in *Food Basket* were sales to retail customers. 383 F.2d at 786. This is significant in treating defendants' later argument that sales to retail customers are never interstate in character.

**10.** The three exceptions that the Fifth Circuit recognizes to this rule are when the goods are purchased by the retailer on specific order of the retail customer for immediate delivery; when the goods are purchased by the retailer according to an understanding of the customer's specific needs, though not for immediate delivery; and when the retailer purchases the goods based on the anticipated needs of specific customers. *Cliff Food Stores v. Kroger*, 417 F.2d at 210.

**11.** The Act's text emphasizes the nature of the seller and the method of sale—placing liability on "any person engaged in commerce" who

makes discriminatory sales "in the course of such commerce." On the other hand, the text of the Act does not require that all purchasers be "in commerce," so long as "either or any" of the purchases are in commerce. In short, the Act is less concerned with where and with whom goods end up than it is with how they get there and who brings them there. Therefore, in determining whether a purchase is "in commerce," the identity and character of the purchaser is of less significance than that of the seller and the physical history of the goods.

**12.** Defendants' theory would require a gas station's pumps and cash register to straddle a state line in order to place the sale of gasoline in interstate commerce. This court rejects this narrow view of the Robinson-Patman Act's jurisdictional requirements. However, in a metaphorical sense, that mythical gas station is pre-

cated a practical and realistic view of the sale's context. The *Copp Paving* Court defined "the flow of interstate commerce" as "the practical, economic continuity in the generation of goods and services for interstate markets *and* their transport and distribution *to the consumer*."[13] *Copp Paving*, 419 U.S. at 195, 95 S.Ct. at 398–99 (emphasis added). In the present case, the gasoline is brought into the states surrounding Utah and sold, essentially unchanged, to consumers in those surrounding states. So long as its character and ownership remain constant, so long as it is not warehoused or otherwise stored for a substantial period, a commodity transported across state boundaries for subsequent sale remains in the flow of commerce.

■ This court holds that when a company purchases gasoline in one state and transports it to another for immediate sale to retail customers, the sales to retail customers are within the flow of commerce. Thus if such sales in commerce reflect price discrimination when compared with gasoline sales in another market, the discrimination falls within the jurisdictional limitations of the Robinson-Patman Act. The allegations of the complaint state a claim for primary line price discrimination.

### 4. Conclusion.

For the reasons stated above, Citgo's motion to dismiss the entire complaint is DENIED. Rio Vista is entitled to discovery on the factual question of Citgo's involvement, if any, in the alleged anticompetitive behavior. Southland and Citgo's motion to dismiss the claims in the complaint based on section 1 of the Sherman Act is likewise DENIED. Plaintiff may have the opportunity to investigate whether the acquisition of Citgo by Southland was illegal and whether any concerted anticompetitive conduct took place between the two corporations during the two periods covered by the complaint when Citgo was not wholly owned by Southland. Plaintiff's claims under the criminal provisions of the Robinson-Patman Act, 15 U.S.C. § 13a, and the Utah criminal code, Utah Code Ann. § 76–10–903, are DISMISSED. No private right of action is implied in either of these sections. Finally, Defendants' motion to dismiss the remainder of count two is DENIED. The complaint alleges a valid claim of primary line price discrimination under the Robinson-Patman Act, 15 U.S.C. § 13.

So ordered.

---

cisely what the court confronts in the present case. Gasoline pumped into Idaho and Colorado cars is brought directly from Utah to the Idaho and Colorado stations; the pumps' hoses (figuratively) stretch across the borders from the source of the fuel in Utah. Prices, according to the complaint's allegations, are set from another state, by an interstate firm, so the cash register's till leads directly into those out-of-state coffers. Thus, giving credence to plaintiff's factual theory, the gasoline purchaser at the Colorado and Idaho 7–Elevens accepts and pays the price set by either Southland (a Texas corporation) or Citgo (a Delaware corporation) for the purchase of gasoline from Utah.

**13.** The language referring to "interstate markets" may be confusing. This cannot be interpreted as requiring a discrimination within a single geographic market that by chance incorporates some state boundary. A claim of primary line price discrimination necessarily implies at least two geographic markets: one, where the plaintiff competes, in which the defendant's predatorily low price is allegedly used to harm competition; the other, in which the defendant charges a higher price, is used to compare with the lower price and thus yield a discrimination. Consonant with this, recent authorities have recognized the obvious proposition that a primary line case does not require that a discrimination occur within a single geographic market. *ITT Continental Baking Co.*, 3 Trade Reg.Rep. (CCH) ¶ 22,188 at pp. 23,0092–93 (F.T.C. July 25, 1984). More importantly, the *ITT Continental* case did not require that either of the two geographic markets involved in a primary line price discrimination case encompass a state boundary; it is enough if the two markets are in different states and supplied by one plant. *Id.*, at pp. 23,0093–94. Without passing on whether this "one plant" requirement ought to be imposed in every case, the court notes that in the present case, the requirement is satisfied: Gasoline for three states was purchased at the same Utah refinery.